Pearson, J.
 

 The case turns upon the legal effect of the sale and delivery to Lewis Belcher. It must have operated in one of three ways. The slaves were simply “ bid in” by Lewis Belcher, acting for the trustee, so that there was no-sale and they continued a part of the original trust fund; or they were purchased by him for himself and as agent of the defendant and Sugg, so as to vest the title in the'three, as tenants in common ; or they were purchased by him to be held in trust for himself and the defendant and Sugg, the legal title being in himself alone.
 

 The proof was, the slave in controversy and three others, together .with other property, had been conveyed by one Robert Belcher to the defendant in trust to sell and pay certain debts, in which Lewis Belcher, the defendant, and Sugg were the persons
 
 'principally interested.
 
 Before the sale, it was agreed between said Lewis Belcher, the defendant, and .Sugg, that, unless the slaves were run up above certain sums, Lewis Belcher should become the purchaser for the benefit of the three, and either of them was after-wards to make sale of them, whenever a favorable opportunity occurred. Accordingly, Lewis Belcher became the purchaser and the slaves were delivered to him. He did not pay or give his note, for the amount of his bids — that was left as a matter of future arrangement.
 

 It is obvious, that the object of the parlies was not simply to bid in” the slaves and allow them to remain a part of the original trust fund, because there were'other persons com cerned in that fund, and because, upon this supposition, there was no occasion for a change of possession and no reason why the trustee should deliver the slaves to Lewis Belcher.
 

 It remains to be decided, did the sale and delivery vest the title in the three as tenants in common, or did it vest the
 
 *73
 
 title in Lewis Belcher in trust for the three. His Honor, we think, properly adopted the former conclusion. The purchase was made for the benefit of the three, and they were to contribute rateably towards the price. The natural inference, then, is, that the title was to be vested in the three, unless there was some purpose to be accomplished by vesting the title in one to the exclusion of the others. We can see no such purpose and reason for excluding the defendant and Sugg irom the legal ownership.
 

 It is suggested, that, as a trustee cannot buy at his own ^sale, there was a necessity for Lewis Belcher to become a trustee for the defendant, and this is a reason, so far as he is concerned, for excluding him from the legal ownership. The position, that “ á trustee cannot buy at his^on’sale,” must be taken with some qualification. He may buy at his own sale and charge himself with the bid; and the
 
 cestuis que trust
 
 may, at their election, hold him bound by it, or may repudiate the sale and treat the property as still belonging to the trust fund. This consequence follows, whether the purchase is made by the instrumentality of an agent, or that of one who is to hold the title as trustee. This suggestion, then, has no weight; and the fact, that the defendant was the person who made the sale, favors the one view as much as the other, and wo are left to adopt the natural inference, that the title was to be in the three, in the absence of any reason for vesting it in one, to the exclusion of the other two, except as
 
 cestui que trust.
 

 It was then insisted, that, if they were tenants in common, the defendant had so converted the slave, as to entitle the plaintiffs to recover an
 
 aliquot
 
 part of the value, in the same way as if he had destroyed the property, The conversion consisted in this: The defendant, as sheriff, sold the slave under an execution in favor of
 
 Sugg,
 
 and he was bought by one Armstrong, “
 
 a citizen of Edgecombe coun-iy”
 

 
 *74
 
 The rule as between tenants in common is, that one cam not maintain trover, unless there be a destruction of the property. The first exception made, (if it can be termed, an exception,) was where a tenant in common of a ship had it repaired, the name changed, and sent it to the
 
 East Indies,
 
 where he sold it and appropriated the whole price to his own use. This was held to be “ tantamount to a destruction,” because the co-tenants could not follow it. In our State, it is held, that if a tenant in common takes a slave ■out of the State to parts unknown, and sells him, the co-ten-fants may treat this as a -destruction of the property.
 
 But
 
 the idea that a sale to “ a citzen of the county” is “ tanta» mount to a destruction,” -is now advanced for the first time, and-cannot be sustained, without putting a tenant in common upon the footing of a mere wrong doer, with whom there is no privity ; for which position there is no-authority and no reason.
 

 •Per Gueiam. Judgment affirmed.